These cases will be called as previously announced. The times will be as allotted to counsel. The first case today is number 171800 and number 181126, United States v. Nimon-Naphaeng. Whenever you're ready, Mr. Outterkirk. May it please the court. My name is John Outterkirk, and I'm arguing on behalf of the defendant. Your Honor, the defendant is asking the court in this particular appeal to consider three main questions. The first is, of the victims that were included in the government's spreadsheet, how many of them were in fact really victims according to the definition of the MBRA, the Mandatory Victims Restitution Act? The second question is, how accurate was the calculation of the amount of restitution for each one of those victims? And the third point being whether or not there was sufficient evidence before the district court to be able to actually make a calculation. I'd like to start out by addressing a point that the government raised in its brief. I understand that in my brief I cited United States v. Archer, which is a Second Circuit case. I also cited United States v. Alphas, which is a First Circuit case. The government contended that Alphas set a different standard in the First Circuit than the one that exists in the Second Circuit for determining victimhood, if you will. And I would argue that's not true. At page 786 in Alphas, this court said that in determining whether a victim is a victim under the act, this means that the government must establish a but-for connection between the defendant's fraud and the victim's loss. But counsel, whether or not the legal standard is the same, right? It seems to me the government's case for victimhood, to use your word, rests on a simple proposition. Your client perpetrated a fraud, which he described as having at its heart, concealing from the people he was dealing with, the fact that he was filing phony asylum applications in order to obtain work permits for them. There is no evidence in the record, nothing in the record, that suggests that he ever filed any legitimate asylum applications. So why isn't the district court entitled from those facts to draw an inference, a reasonable inference, that everyone who paid money to this fraudster was a victim of his fraud? I have several answers to that, Your Honor. But do you have any good ones? Well, I don't know. That will be up to you to decide. We'll find out when you write your opinion. Counsel, I'm sorry, and just to add to that, it was what Judge Selya just said. This was based upon his admission during his Rule 11 colloquy. He admitted to this particular scheme. Okay, that, I really like Judge Thompson's description. Because he admitted to the scheme. There is no question that he admitted to the scheme. There's a great deal of discussion about the word heart, at the heart of this scheme. The heart of this scheme was not drawn from the defendant's testimony. That was from the plea agreement that the defendant did in fact agree to, not only in writing by his signature, but also in open court when it was recited to the district court judge. However, as Judge Selya pointed out, what he promised to do was get them work cards. Granted, he had a fraudulent method of getting the work cards in mind. But what he promised to do was get them employment authorization documentation. And he did, in fact, do that. But you don't think that it's implicit in the scheme, that he would get them valid employment authorization documents, not documents which were issued based on illegitimate applications? And again, Your Honor, we're not trying to imply that the defendant did not engage in this scheme. The question that we're asking the court- That would be a tough implication to make since he's already been convicted. And because he pled guilty. Yes. What we're asking the court to do is to recognize the fact that there were some, at least some identifiable ones, and I pointed to them in my brief, who knew what he was doing was filing for asylum. No, what you pointed to in your brief was you pointed to a couple of victims who said that at some time they knew what he was doing. But it is unclear from the record, when you go back to those references, whether they knew that at the time they paid him the money, or they knew that at the time the government investigator approached them and they made the statements that are quoted in the record. I agree, and that is exactly the point that we are raising. There should have been clarity in the record as to when they found that out. But where there is evidence in the record that can support one of two equally reasonable but conflicting inferences, that's the district court's responsibility to choose between those inferences. And Judge Smith drew that inference here, contrary to your client. How can that be error under our case law? I'm sorry, your honor, I didn't mean to interrupt. But here, where the defense specifically made offers of proof to the judge and said, we would like to cross-examine. We would like to produce the evidence that will give you hard evidence in order to be able to make those determinations. The district court judge instead did not take that evidence, did not even hear that evidence, and chose to draw the inferences with no evidence before him instead. What is your offer of proof that would negate what Judge Smith found? There were offers of proof. And I know I think I've cited all of them in the brief. But there was an offer of proof in the appendix at page 104. There was also an offer of proof proffered at page 75 in the appendix, page 80 in the appendix, where the trial court, the defense attorney said, your honor, we would like to present you evidence because we don't believe that all of these victims were, in fact, victims under the definition of the act. What is the offer of proof? The offer of proof was, judge, we'd like to continue to cross-examine.  And then they would say, look, there was an exchange, and I did mention this in my brief, where the trial court judge even says, are you trying to tell me that you don't think all of these victims are victims? And the defense counsel said, yes, your honor, that's exactly what I'm trying to tell you. But you seem to somehow be suggesting that it constitutes an offer of proof to say, judge, we'd like to supply evidence of X. That's not an offer of proof. An offer of proof is, judge, here's X. We'd like you to admit this into evidence. You never pointed to anything. There were a number of occasions where the defense attorney said, judge, there is evidence in this record. But you never described any such evidence. You never tendered it to the judge so he could accept it or reject it. You were permitted to cross-examine. I know that you say that you weren't permitted to cross-examine long enough. But the right to cross-examination isn't a right to endless cross-examination. I concede that point. However, thinking about the fact that, according to the government, this case included, I'm sorry, 368 victims. There's no way that you can properly present evidence. And the court was required to take evidence, or at least to make findings. Council, can I ask you a question about that number? So my understanding is that there might have been some evidence available with respect to three of the alleged victims. And that evidence would go to whether or not they thought that an application for asylum was being processed for them. But that's the only proffer that I saw with respect to any knowledge that they might have about this, is that there might be an application for asylum. And my question is, how is evidence that somebody thought an application for asylum was being prepared for them and filed for them. An indication that they were part of a fraudulent scheme, that they understood that there was a difference between asylum and getting an employment authorization document. It seemed to me that the evidence that was proffered, to the extent that any proffer was made. Or that the evidence that was available doesn't even go to criminality or knowledge of criminality. What is your response to that? I understand I'm out of time, so I'll try and be extremely brief. Two responses, the first of which is, if they knew that he was applying for asylum, then they don't fall under the but-for definition of victimhood. The second, and I- Well, wait, why is that? Because if they were aware of the means by which he was obtaining them the card, then they were implicitly agreeing to participation in that scheme, which means they are no longer an- What is the evidence that each of those, or any of those three, knew that that was fraudulent? Two of them in their documentation for the pre-sentence report said, they gave the money to him for processing their asylum claim. And one of them wrote on the memo line of the check that he gave- Not to belabor the point, but how does that proffer show anything about their knowledge of the criminality involved in the scheme? Or put differently, they could have legitimately thought that he was legally applying for asylum for them. They may not even know the difference between an EAD and asylum. I'm not saying that there isn't a difference, or that they didn't know. I'm saying, what was the proffer that would suggest that they knew the difference? These three folks out of 370, roughly. Well, I'm gonna answer two questions at once. The first question being, why does just these three make any difference? And your question, Judge Howard. What the defense was saying is, we have proof of these three that knowingly participated in applying for asylum to get a work card. We have 55 who submitted their documentation with no explanation of why they gave him the money. All they said was, we gave him money. We had 219 victims who never contacted probation or the government's agent. They were just part of a blanket search for every application that was made that had certain repetitive language in it. And it was therefore assumed, because that repetitive language was the same in all 219 of those, that they must have been filed by Mr. Nefrank. I'm not arguing that it's not a reasonable assumption, but given the fact that there are three that were identified as participating in the scheme knowingly, and that there were 219 we know nothing about. And the rest of them just came from banking records of the defendant, that the trial court had some sort of an obligation to at least inquire. Because, now to answer your question, Chief Howard, if they participated in the scheme, they were not harmed by actions that were unknown to them. And if they were not harmed by actions that were unknown to them, then they don't fit the definition in the act. Thank you. Thank you very much for the extra time, Your Honors. Good morning, Donald Lockhart for the government. The defendant admitted three significant things as part of the plea colloquy, both in writing and at the actual plea. First, that the scheme was 16 months in duration, so we have a very long running scheme. Second, that at the very heart of this scheme, the essence of this scheme was to conceal from the victims the fact that the defendant would be filing asylum applications on their behalf. So for a period of 16 months, the defendant said, he engaged in a scheme that the heart of which was to do that. And number three, he typically charged the victims between $1,500 and $2,500 in each case. Now, the defendant never claimed, either in the district court or now on appeal, that he himself disclosed to a particular victim the fact that an asylum application would be filed on behalf of that victim. Now, the defendant- Can I ask you a practical, well, I'll point out one practicality and ask you one practical question. This gentleman has been deported to Thailand, so the likelihood of any restitution getting collected is pretty remote. But to the extent you were able to collect fully, you have 219 people whose whereabouts are unknown, I assume. Well, there are two things, Your Honor. First of all, as the record and our brief make clear, we do have about $285,000 of the defendant's assets frozen. So we would be able, at a minimum, to put our hands on that money. Whether we will find other assets of the defendant after that is unclear. On the second point, locating the victims to get them the money, that'll be a challenge. The probation office and our office will have to work on that. We're not going to succeed in every case, that's pretty clear. When the system is designed so that if we can't find a victim, ultimately some of those monies will go to a separate fund. I think it's a victim witness sort of fund. So the money will be put to good use, even if we can't track down every single one of those 219 people that you're talking about. But yes, logistically, there will be issues. As long as we've alerted you from your planned argument, let me ask you another question. Do we have jurisdiction, put it this way, did the district court have jurisdiction to enter the restitution order that's before us on appeal? Yes, it did. The statute, the MVRA, has a specific provision allowing for deferred restitution. I understand that, but what about the intervening notice of appeal? Yes, we address that in a footnote in our brief. We feel you do have jurisdiction because although the notice of appeal was filed after the district court's order- No, no, no, I'm not talking about the second notice of appeal. I'm talking about the first notice of appeal. When the first notice of appeal after the district court pronounced sentence and entered the provisional restitution order, not the restitution order that's now being appealed, all right? The defendant filed the notice of appeal. That notice of appeal, a notice of appeal typically ousts the district court of jurisdiction. But the district court here, despite the fact that that first notice of appeal was still pending, went ahead and amended the restitution order. And I'm questioning whether it had jurisdiction to do that. Well, yes, I mean, the- Why? As I said, the MVRA expressly contemplates this exact situation that it should- No, the MVRA doesn't say anything about an intervening appeal. There's no question that the district court could have entered the provisional restitution order and then amended it. But the Supreme Court- But that contemplates that it had jurisdiction to do that. The Supreme Court in the Manrique case, which we cite in the same footnote, says that you should file two notices of appeal in this circumstance, which implies that the district court would not be ousted of jurisdiction to amend the restitution order in between those two events. And it's just the logical implication, I think, of the MVRA, that if a district court judge is to be able to amend the restitution order, and if we know, as we do, that a first notice of appeal must be filed to preserve the defendant's rights in that context, then it necessarily follows that a district court can't be ousted of jurisdiction between those two events. Otherwise, the judge would never be able to do what the MVRA says the judge can do. That's certainly not so, Mr. Lockhart. Federal rules of appellate procedures specifically contemplate that district court in that situation can ask the Court of Appeals to remand for the purpose of allowing him to enter the supplementary or second order. But that procedure wasn't followed here. We've got cases in other situations. The Zoe Calicatroni case for one, where we have called for the attention of district courts and council that that's the proper procedure where the district court wishes to amend or enter a supplementary order and has lost jurisdiction. Well, I can only say that the MVRA context is different, I think, from any of the other cases that you've addressed on that point. And the statute itself seems to contemplate exactly what was done here. If I could return to the argument, our point is that the defendant himself is in the best position to know if he made specific disclosures to particular victims concerning the fact that he was filing an asylum application on their behalf. And here, the defendant never once said, either below or on appeal, yes, I made a disclosure to a particular victim. That in itself is significant. Beyond the defendant's admissions, beyond the fact that he never once claimed to have made disclosures to particular victims, we have the agent's testimony that all 20 of the victims he interviewed pre-indictment during the investigatory phase of the case all said to a person, we had no idea an asylum application was being filed on our behalf. And then later on, in connection with sentencing, as the agent is trying to build the case for restitution, the agent speaks with 89 or 90 further people and asks roughly 60 of them, did you know about the asylum application? Now, the direct examination is a little muddy, but on cross-examination, the agent clarifies that all of those people said that they did not know about the asylum application. So we actually have not just the defendant's admissions, not just his failure to make a claim that he made disclosures, but we also have testimony from the agent concerning a fairly large group of victims who all said to a person that they were not told. And then finally, we have as evidence the defendant's flyers that he put up in the restaurants, none of which disclosed that this was an asylum application thing, it was just a work permit thing. So that is the main factual point. On the Second Circuit's Archer case, the main case the defendant relies on, our point is not really so much that Archer is necessarily in conflict with the First Circuit's case law. Our point is that it's factually distinguishable, or our case is factually distinguishable, at least in two significant ways. First off, Archer was a distinct visa fraud case where there was actually concrete evidence that individual victims were actively complicit in that scheme. Whereas here, the defendant admits that the very heart of the scheme is to conceal the information from the victims, and the evidence that individual victims were aware is slender at best from our standpoint. If the evidence proffered with respect to the three or so individuals at issue were stronger, in terms of their awareness that asylum applications were being filed, does the government still argue that just as a math matter, because it's a de minimis number of the alleged victims, that it just doesn't matter? Well, that's a big if. If the evidence were stronger, it's not for reasons I can get into, but if the evidence were stronger, I think the result would be perhaps a remand just to excise the restitution. So you're not relying on the de minimis number itself. I mean, that may play a part of whether it's believable that they were not victims of the overall scheme. Yeah. Well, let's assume for sake of argument that in the case of three victims, they write statements which make it glaringly clear that they were part of the fraud, they were active fraudsters, that might result in a remand to get rid of the restitution for those three people, but we have a big distinction here, two big distinctions. One noted by Judge Selya and another suggested by Judge Thompson. First, there's the question of timing. To the extent some of these statements indicate an awareness of the asylum application, when did the victim actually come to learn of that? It's very natural for victims after the fact to learn from conversations with agents that something is the case. If you have a scheme to defraud somebody of, you know, saying that aluminum bar is a silver bar, the victim might later say, well, I'm one of the victims who bought the aluminum bars from the defendant. Does that mean that they knew they were aluminum? No, of course, of course not. So there's the timing issue. And then there's the point that Judge Thompson focused in on, and I think you did as well, Judge Howard, which is awareness of the fraudulent nature of this and even the distinction between asylum and work permits. Remember, we're dealing with Thai nationals who don't, most of them speak English, complicated immigration concepts. So anyway, I can see I'm well over my time. If there are no further questions, I'll rest on the brief. Thank you. Thank you both.